# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| InPhase Technologies, Inc. | ) |
| | )     Case No. 11-34489-MER |
| | )     Chapter 11 |
| Debtor. | ) |

## MOTION FOR RELIEF FROM STAY

Acadia Woods Partners, LLC ("Acadia"), a secured creditor of Debtor InPhase Technologies, Inc. ("Debtor" or "InPhase"), hereby moves, pursuant to 11 U.S.C. §362(d) and Local Bankruptcy 4001-1(a), for relief from the automatic stay arising from the filing of this bankruptcy proceeding.

Acadia seeks such relief so that it may proceed with the Article 9 sale of certain of Debtor's property, which sale was scheduled to begin less than one hour before this voluntary Chapter 11 was filed by Debtor.  Acadia seeks to proceed with such sale pursuant to a money judgment and judgment granting Acadia replevin to seize such property and proceed with sale, which judgment was entered by the Boulder District Court pursuant to a stipulation with Debtor. Acadia has been in possession of and paying to preserve such collateral for several months.

Debtor has not been operational for well over a year.  Before it terminated operations InPhase was attempting to develop a laser storage technology, which was never fully developed or brought to market.  InPhases' assets, Acadia's collateral, are technology based and rapidly diminishing in value.  Acadia should not be forced to endure further delay tactics by Debtor and its controlling shareholders, Signal Lake Side Fund LP and Signal Lake Side Fund II LP (together the "Signal Entities").

## Preliminary Recitals

1.      Debtor filed its voluntary chapter 11 petition commencing this proceeding on October 18, 2011 at approximately 9:30 am (MST).

2.      Acadia seeks to terminate, annul, lift or modify the stay to permit Acadia to proceed with the Article 9 sale of Debtor's personal property, including intellectual property, which sale was scheduled to occur on October 18, 2011 at 10:00 am (MST).

3.      Acadia does not seek relief from any co-debtor stay.

**Debtor**

      4.      Debtor was a technology company that was engaged in the development of a laser storage technology.  This technology, although promising and involving investment of many millions of dollars, never generated a final product which was taken to market.

      5.      At the end of January, 2010, Debtor closed its doors and terminated all of its employees.  It reopened and rehired employees for several months in 2010 with funds loaned by Acadia but shut its doors and terminated all remaining employees in October, 2010.

**Movant/Acadia**

      6.      On or about March 16, 2010, Acadia lent Debtor the sum of $5,000,000 (the "Loan").

      7.      The Loan was evidenced by a Convertible Demand Note dated March 16, 2010 in the original principal amount of $10,000,000 (the "Note") by Debtor.  A true and correct copy of the Note is attached hereto as Exhibit A.

      8.      The Loan was secured in part by a written Security Agreement dated March 16, 2010 by Debtor in favor of Acadia (the "Security Agreement").  A true and correct copy of the Security Agreement is attached hereto as Exhibit B.

      9.      Acadia filed a UCC financing statement with the Delaware Secretary of State's office, State of Debtor's incorporation, perfecting Acadia's security interest in collateral under the Security Agreement.  A copy of Acadia's UCC financing statement as filed is attached hereto as Exhibit C.

      10.     Pursuant to the Security Agreement (section 2), Debtor granted Acadia a security agreement in all Collateral, defined by the Security Agreement (section 1) to include all of the Debtor's then existing and future "Receivables," "Contracts," "Equipment," "General Intangibles," "Insurance Policies," "Licenses," "Intellectual Property" and all proceeds thereof.

      11.     Pursuant to the Security Agreement (section 4), Debtor granted Acadia, upon an Event of Default (including failure to pay all amounts demanded pursuant to the Note), among other things, all rights and remedies of Secured Party under the Note and all rights and remedies of a secured party under the applicable Uniform Commercial Code.  Debtor further granted Acadia the right "to sell, resell, assign, grant options for or otherwise dispose of any Collateral for cash and/or credit, and upon any terms, at such place(s) and time(s) and to such person(s) as [Acadia] deems best, all without demand, notice or advertisement whatsoever except that where an applicable statute requires reasonable notice of sale or other disposition."

      12.     The Security Agreement provides (section 8) that it is governed by New York law.

      13.     The Loan was made by Acadia with the express, written agreement that Debtor

was to receive additional funding of at least $4 million from the Signal Entities concurrently with Acadia's funding.

14.     Contemporaneous with the Loan, the Signal Entities acquired the majority of Debtor's capital stock, in part using funds advanced by Acadia to Debtor.  The Signal Entities received promissory notes totaling $30 million from Debtor in anticipation of future funds to be loaned by the Signal Entities to Debtor.

15.     The Loan, coupled with funds to be advance contemporaneously by the Signal Entities, was for the purpose of restarting Debtor's operations, to complete the development of Debtor's laser storage technology and to bring that product to the market.

16.     The Signal Entities failed to advance any new funds to Debtor contemporaneous with the Loan.

**Default and State Court Judgment Granting Acadia Money Judgment and Replevin**

17.     After the Signal Entities failed to advance even $4 million in new funds to Debtor, Acadia made demand for repayment pursuant to the Note and made demand for possession of its collateral pursuant to the Security Agreement.

18.     Debtor refused to comply with Acadia's demands and in early September, 2010, Acadia filed its Verified Complaint for Replevin and action on Underlying Debt and for Injunctive Relief, commencing a lawsuit in Boulder District Court (Case No. 2010CV964)(the "Boulder Lawsuit").  A copy of the Verified Complaint (without exhibits – which are attached separately as exhibits to this Motion) is attached hereto as Exhibit D.

19.     The Boulder District Court initially granted Acadia's motion for replevin and Acadia expended funds in preparation for an Article 9 sale.

20.     The Signal Entities intervened in the Boulder Lawsuit and claimed, pursuant to an Intercreditor Agreement entered by the parties contemporaneous with the Loan that Acadia should not be permitted to proceed with the sale.

21.     The Court vacated its initial order and set an expedited schedule for discovery and trial.

22.     In October of 2010, Debtor terminated its employees and again ceased operation.

23.     Following extensive, expedited discovery and litigation and less than one month before trial, the parties (Acadia, Debtor and the Signal Entities) entered a stipulation in part for payment by Debtor to Acadia by a date certain and for entry of a Judgment if such payments were not made.

24.     Debtor failed to pay Acadia pursuant to the Stipulation.

25.     On July 7, 2007, the Boulder District Court entered a judgment in favor of Acadia against Debtor in the amount of $6,000,000.  Acadia was also given the right to take possession of its Collateral.  A copy of the Judgment is attached hereto as Exhibit E.

26.     Pursuant to the Boulder District Court Judgment, Acadia again scheduled an Article 9 sale of Debtor's property, Acadia's collateral, which sale was scheduled to commence 30 minutes before Debtor commenced these proceedings; i.e. on October 18, 2011 at 10:00 am (MST).

## Collateral

27.     Debtor owns "Equipment" as defined by and governed by the Security Agreement, which is subject to Acadia's security interest under the Security Agreement listed in documents attached hereto as Exhibits F and G.

28.     Debtor has "General Intangibles" as defined and governed by the Security Agreement, which are subject to Acadia's security interest.  Such General Intangibles includes, without limitation, the following:  (a) customer lists, (b) accounts receivables lists, (c) contracts and contract lists, (d) copyright, trademark and patent lists and registration applications and related materials, (e) inventory records, (f) accounting information, books and records relating to Debtor's operations and assets, and (g) data plans, blueprints, specification designs, drawings, surveys, engineering reports, test reports, manuals, materials, catalogs, research data, computer software and programs pertaining to the Debtor's operations.

29.     Debtor has limited "Inventory" as defined and governed by the Security Agreement, which is subject to Acadia's security interest.

30.     Debtor has "Intellectual Property" as defined and governed by the Security Agreement, which is subject to Acadia's security interest.  A listing of Debtor's Intellectual Property is attached hereto as Exhibit H-1 and H-2.

31.     All of the debtor's physical property that is the subject of the Security Agreement is located at Debtor's former premises located at 2000 Pike Road, Longmont Colorado.

32.     Acadia is in possession of all of Debtor's physical property.  It rents the Debtor's former premises and it has been paying for the maintenance and preservation of its Collateral, including for maintenance and protection of patent and other intellectual property of the Debtor which is Acadia's Collateral.

## Other Allegations

33.     Debtor ceased all operations over one year ago.  It has no employees and no active business.

34.     Debtor does not maintain any insurance for any of its assets, including Acadia's collateral. All of Debtor's physical property is in Acadia's possession contained in property rented and maintained by Acadia. All insurance and other expenses necessary to maintain Debtor's physical property and intellectual property have, for the past 90 days, been paid by Acadia, not Debtor.

35.     Debtor's assets are all technology related and are rapidly diminishing in value.

36.     Kevin Curtis estimated that Acadia's Collateral was worth $2.5 to 3 million when Acadia made the Loan to Debtor. Mr. Curtis was one of Debtor's founders, its chief technology officer until Debtor was shut down in January, 2010, and was rehired as Debtor's Chief Executive Officer and was one of three of Debtor's directors during the period following Acadia's loan until shortly before Debtor shut its doors a second time. Mr. Curtis testified at the replevin hearing in the Boulder Lawsuit that Acadia's collateral was then worth $2.5 to $3 million. At deposition in the Boulder Lawsuit, Mr. Curtis gave like testimony and testified that Debtor had no prospect of reorganization. Excerpts from Mr. Curtis' deposition are attached as Exhibit I.

37.     In the Verified Complaint, Acadia estimated the value of its Collateral to be $3 million.

38.     In addition to Acadia's $6 million money judgment secured by the Collateral, the Signal Entities claim to be owed more than $5 million dollars secured by the same Collateral (albeit junior to Acadia's security interest pursuant to the Judgment in the Boulder Lawsuit).

## **RELIEF FROM STAY**

39.     Acadia seeks relief from stay pursuant to 11 U.S.C §362(d)(1) and/or §362(d)(2), either of which is sufficient basis for the Court grant Acadia relief from stay. *See Sun Valley Ranches v. Equitable Life Assur. Society (In re Sun Valley Ranches, Inc.), 823 F.2d 1373, 1376 (9th Cir. 1987)*. Section 362(d) provides that relief from stay shall be granted:

> On request of a party in interest and after notice and a hearing, the court **shall** grant relief from the stay . . .
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; **or**
>
> (2) with respect to a stay of an act against property . . .
>      (A) the debtor does not have equity in such property; and
>      (B) such property is not necessary to an effective reorganization

11 U.S.C §362(d)(emphasis added). The burden of proof for resisting the stay is on the Debtor as to all issues except for the Debtor's lack of equity in the property. *In re DB Capital Holding, LLC, 454 B.R. 804, 816 (B.R.D. Colo. 2011)*.

## Cause – Section 362(d)(1)

40.    Section 362(d)(1) of the Bankruptcy Code provides that the Court "shall grant relief from stay . . . for cause."  Cause is not defined by the Code and must be based upon a case by case inquiry.  *See, In re Busch, 294 B.R. 137 (B.A.P. 10th Cir. 2003)(affirming lifting of stay to permit pending litigation to proceed);In re Hough, 2002 Bankr. LEXISR. 17 (B.A.P. 10th Cir. 2002)(affirming lifting of stay to permit pending litigation to proceed).*

41.    There is cause to grant relief from stay in this case.  First, Debtor's property is all technology related equipment and or intellectual property that is rapidly diminishing in value.

42.    Debtor cannot provide Acadia with adequate protection for the rapid diminution of the value of its collateral because Debtor does not have any cash or liquid assets to provide such protection.  A secured creditor lacks adequate protection if there is a risk that the value of the property securing its claim will decline.  *Delaney-Morin v. Day (In re Delaney-Morin), 304 B.R. 365, 370 n.3 (B.A.P. 9th Cir. 2003).*

43.    Further, Debtor having closed its door and terminated all employees one year ago (and twice within the last two years).  Debtor has unsuccessfully (with the exception of Acadia's loan) sought new capital to complete development of its product and bring it to market.  Now, two years after Debtor's first shut-down, Debtor has no greater or reasonable prospect of completing the development of its laser storage technology and is now two years behind any competition in developing such technology and products.  Debtor must show some reasonable prospect of obtaining post-petition financing or other means to provide adequate protection.  *In re DB Capital Holding, LLC, 454 B.R. 804, 817-18 (B.R.D. Colo. 2011).*

44.    Debtor's late filing of its voluntary Chapter 11 petition – 30 minutes before a long notices Article 9 sale – evidences that the filing is no more than a delay tactic and that Debtor filed its petition in bad faith.

45.    Finally, Acadia will show that since March, 2010, when Acadia injected $5 million dollars in Debtor and the Signal Entities were able to acquire control over Debtor, the Signal Entities have managed and used Debtor for their private and personal benefit and to the detriment of Debtor's creditors, including Acadia, in violation of their fiduciary duties owed to Debtor and to its creditors (because of Debtor's longstanding insolvency).  This bankruptcy filing is merely the most recent act of bad faith by Debtor under the direction and control of the Signal Entities.

## Lack of equity and no prospect of reorganization – Section 362(d)(2)

46.    Debtor has no equity in the Collateral.  A debtor has no equity in the property for purposed of section 362(d)(2) when the debts secured by liens on the property exceed the value of the property.  *3 Lawrence P. King, Collier on Bankruptcy, ¶ 362.07[4][a] (15th ed. 2003); and see Steward v. Gurley, 745 F.2d 1194, 1195 (9th Cir. 1984).*

47.     According to Mr. Curtis, Debtor's CEO in 2010, the Collateral was worth no more than $3 million over one year ago.  Acadia will offer additional evidence as necessary to establish the value of the Collateral.

48.     The Collateral is subject to Acadia's $6 million judgment and may also be subject to secured claims by the Signal Entities that claim to be owed more than $5 million by Debtor.

49.     Debtor cannot show it has any prospect of an effective reorganization within a reasonable period of time, a matter which Debtor has the burden to prove.  *See, United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 376 (1988); John Hancock Mut. Life Ins. V. Route 37 Bus. Park Assoc., 987 F.2d 154, 157 (3rd Cir. 1993).* Although it is early in the case, Debtor must still make a showing of a reasonable possibility of a successful reorganization within a reasonable time.  *In re DB Capital Holding, LLC, 454 B.R. 804, 819-20 (B.R.D. Colo. 2011).*

50.     Debtor (through the Signal Entities) has unsuccessfully attempted to raise capital to fund Debtor's further development and business operations.  There is no reasonable prospect that after two years without success that Debtor will be able to fund an effective reorganization to develop technology that has remained idle for the last year and much of the last two years.


WHEREFORE, Acadia respectfully prays:

A.     For an Order granting relief from the stay under 11 U. S.C. §362 or any other stay or injunction contained in any order of this Court to permit Acadia to exercise its rights as a secured party as to the Collateral including but not limited to proceeding with the sale of such collateral by public auction.

B.     For such other and further relief as is just and equitable under the circumstances.


Respectfully submitted on October 21, 2011.

ACADIA WOODS PARTNERS, LLC

By his Attorneys,

GREGORY & PLOTKIN, LLC


/s/ John C. Plotkin
John C. Plotkin, No. 31035
1331 17th St., Suite 800
Denver, CO 80202
(303) 292-1932

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of October, 2011, a true and correct copy of the foregoing document was served by electronic mail via the Court's ECF Filing/Service System, to the persons listed on the service list below.


/s/ John C. Plotkin


Joel Laufer
5290 DTC Parkway, Suite 150
Englewood, CO 80111

United States Trustee
999 18th St. Suite 1551
Denver, CO 80202

And caused the above to served by first class mail to the persons listed on the mailing matrix below.

Alan K. Motes, Esq.
Office of the United States Trustee
999 18th Street, Suite 1551
Denver, Colorado 80202-2415